**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL KNEPP,** | : | **CIVIL ACTION NO. 1:03-CV-1993** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **OVERHEAD DOOR CORPORATION,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Presently before the court is a motion for summary judgment (Doc. 29) filed by defendant, Overhead Door Corporation ("Overhead"), on the claims of plaintiff Daniel Knepp ("Knepp") brought pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Pennsylvania Human Relations Act ("PHRA"), PA. STAT. ANN. tit. 43, §§ 951-963.  For the reasons that follow the motion will be granted.

## I.  <u>Statement of Facts</u>

In September 1996, Knepp began working for Overhead in its door manufacturing plant in Lewistown, Pennsylvania.  (Doc. 41, Ex. U at 2).  He was assigned to a field service technician ("FST") position in October 2000.  (Doc. 32, Ex. D at 6).  At that time Overhead had four individuals employed as FSTs, who were responsible for servicing, installing, and conducting training on the doors that it manufactured.  (Doc. 32, Ex. A at 14; Doc. 32, Ex. E at 22; Doc. 37 Att. 4 at 2).

These doors could measure over ten feet by ten feet and weigh over 40,000 pounds. (Doc. 32, Ex. A at 19; Doc. 32, Ex. H at 4).  An FST is required to use ladders, lifts, and tie-lines at heights of seventy feet.  (Doc. 32, Ex. A at 15; Doc. 41, Ex. U at 3-4).

FSTs work an irregular schedule.  The hours are often long and erratic, structured to minimize interference with a customer's business.  (Doc. 32, Ex. A at 60-61; Doc. 32, Ex. B. at 74-75, 97, 100).  For example, an FST could be expected to work twelve hours a day for a week, or a straight twenty-four hour shift.  (Doc. 32, Ex. L at 2, 11, 43).

An FST is required to possess a valid driver's license, and spends approximately eighty percent of the time traveling throughout the United States, either alone or with another FST.  (Doc. 32, Ex. A at 10-11; Doc. 32, Ex. B. at 22-23, 93; Doc. 32, Ex. F at 16-17; Doc. 32, Ex. G Pt. II at 159; Doc. 41, Ex. Q at 2).  FSTs typically drive Overhead or rented vehicles to their job sites, (Doc. 32, Ex. B. at 24; Doc. 32, Ex. F at 17; Doc. 32, Ex. G Pt. II at 117), and Overhead requires that, when traveling long distances, FSTs travel in pairs and take turns driving.  (Doc. 32, Ex. B. at 93-94; Doc. 37, Att. 3 at 6).  Further, FSTs who are working together may be separated at any given time, with individual technicians required to fly or drive to other locations at a moment's notice.  (Doc. 32, Ex. B Pt. II at 10; Doc. 32, Ex. M at 2).

Between October 2000 and September 2001, FSTs working with Knepp noticed that on various occasions he would arrive for work smelling of alcohol and appearing hung over.  (Doc. 32, Ex. F at 20; Doc. 32, Ex. H at 3; Doc. 32, Ex. L at 4-6,

13-14; Doc. 32, Ex. M at 5; Doc. 37, Att. 3 at 6, 7-8; Doc. 37, Att. 4 at 5).  There were times when Knepp would not be permitted to drive because of his condition, and when his duties were limited out of a concern for safety.[1]  (Doc. 32, Ex. L at 4-5, 13-14; Doc. 37, Att. 3 at 6, 7-8; Doc. 37, Att. 4 at 6).  On several occasions Knepp's coworkers discussed with him their consternation about his drinking.  (Doc. 32, Ex. L at 9; Doc. 32, Ex. M at 6).  Knepp was warned of the dangerous nature of FST job duties and reminded that he could be required to drive to a distant job site on very short notice.  (Doc. 32, Ex. M at 25).

Knepp's alcohol-related problems continued to occur.  On one occasion he entered the motel room of a co-worker and jumped on him as he lay on his bed.  (Doc. 32, Ex. H at 3; Doc. 32, Ex. M at 8; Doc. 41, Ex. T at 2).  On another occasion Knepp became aggressive and started a physical altercation with a coworker when asked to perform a task.  (Doc. 32, Ex. L at 6).  Following this incident the coworker refused to work with Knepp and contacted the union.  (Doc. 32, Ex. H at 23; Doc. 32, Ex. L at 6-7, 14).

Shortly thereafter, in September 2001, two FSTs mentioned Knepp's drinking to Overhead's Safety and Health Administrator ("SHA").  (Doc. 32, Ex. B. Pt. II at 13; Doc. 32, Ex. G at 24-26, 28-29).  The employees were directed to contact Overhead's Director of Human Resources ("Director").  (Doc. 32, Ex. G at 26).  On

---

[1]  It is not asserted that Knepp drank while working, but rather that his drinking interfered with various aspects of his work performance.  (Doc. 32, Ex. F at 20; Doc. 37, Att. 3 at 5).

Friday, October 19, 2001, the employees contacted the Director and relayed concerns about Knepp's conduct.  (Doc. 32, Ex. H at 7).  They complained that Knepp consumed alcohol heavily while traveling for Overhead, that he was unable to arrive timely at job sites, to perform adequately his duties, or to drive the company vehicle.  (Doc. 32, Ex. B. at 32).  They stated that Knepp was using the company vehicle to go to bars after work, and that, on one, occasion he became so inebriated that he failed to report to the job site the next morning.[2]  (Doc. 32, Ex. B. at 38-39, 44, 51).  A union representative also contacted the Director and raised concerns for the safety of the other FSTs.  (Doc. 32, Ex. H at 3-4, 23).  In response, Overhead commenced an investigation into the allegations.  (Doc. 32, Ex. B. at 33).

Three days later, on Monday, October 22, 2000, Knepp's union representatives contacted Overhead and relayed that Knepp wanted help for a drinking problem.  The union representatives asked that Knepp be placed into Overhead's alcohol abuse program.  (Doc. 32, Ex. G at 33, 47; Doc. 32, Ex. H at 2).  The SHA, the Director, and Overhead's Vice President of Operations ("Vice President") were immediately apprised of the situation.  (Doc. 32, Ex. H at 2; Doc. 37, Att. 7 at 2).  On the same day, the SHA, Knepp's field service supervisor, two union representatives, Knepp, his wife, and his father-in-law attended a

---

[2] It was alleged that Knepp missed a ride to the job site because of his drinking, and that someone had to return to the hotel to retrieve him later in the day.  (Doc. 32, Ex. L at 10; Doc. 32, Ex. M at 10).  Knepp disputes this, and submitted an affidavit averring that, on the occasion in question, he overslept due to exhaustion from working exceedingly long hours over a seven-day period.  (Doc. 37, Attach. 8 at 1).

meeting at Overhead to discuss the matter.  (Doc. 32, Ex. B. at 62-64; Doc. 32, Ex. G at 47-48, 88).  Knepp asked Overhead for help with his alcoholism, and expressed concerns about losing his job.  (Doc. 32, Ex. G at 49).  The SHA read and thoroughly explained Overhead's alcohol program form to Knepp, after which Knepp and the union representatives signed it.[3]  (Doc. 32, Ex. B. Pt. II at 13; Doc. 32, Ex. G at 49-50).

Two days later Knepp's physician signed a certification for him to take leave from Overhead under the FMLA.  The certification called for Knepp's "observation for detoxification" followed by an "intensive inpatient treatment" program, (Doc. 32, Ex. B. Pt. II at 2).  Leave was scheduled to commence immediately and to conclude approximately one month later.  (Doc. 32, Ex. B. Pt. II at 2-3, 6).

A week later the SHA was contacted by Knepp and his rehabilitation counselor.  (Doc. 32, Ex. B. at 28; Doc. 32, Ex. G at 61, 63; Doc. 37, Att. 6 at 14).  Knepp stated that he learned much about himself and his problem, that the addiction was something he would have for the rest of his life, that he understood that he was an "active" addict who put drinking before all else, and that he needed to attend Alcoholics Anonymous ("AA") meetings.  (Doc. 32, Ex. G at 62; Doc. 32, Ex.

---

[3]  The form states that "management is willing to help" Knepp with his problem, but that certain guidelines must be observed:  Knepp was to receive an appointment from a drug and alcohol counselor and would be provided with either rehabilitation or counseling treatment.  He was to be tested for drugs or alcohol after thirty days, and tested randomly thereafter.  If the tests were negative his employment with Overhead would continue, but if the results were positive his employment would be terminated.  (Doc. 32, Ex. A at 51-52).  Knepp was required to complete any counseling sessions suggested by his physicians, and warned that failure to do so would lead to his termination.  (Doc. 32, Ex. A at 51; Doc. 32, Ex. A Pt. II at 28).

G Pt. II at 25).  The counselor made several recommendations to the SHA to help
Knepp transition back to Overhead successfully and to limit relapse-inducing
stressors.  (Doc. 32, Ex. G at 62).  These recommendations included regular
attendance at AA meetings and shorter, eight-hour workdays.[4]  (Doc. 32, Ex. G at
63, 77-78).

The SHA indicated that, in his current position with Overhead, Knepp was
required to work long hours and to travel.  The SHA also expressed concern that
Knepp could be in situations where a vehicle to attend AA meetings would not be
available.  (Doc. 32, Ex. G at 78-79).

While Knepp was in rehabilitation, Overhead continued its investigation
into the complaints of his conduct.  (Doc. 32, Ex. B. at 15).  The SHA discovered
that, three years earlier, Knepp had been granted a five-week FMLA leave for
alcohol-related inpatient rehabilitation and detoxification.  (Doc. 32, Ex. A Pt. II at
18-21; Doc. 32, Ex. G Pt. II at 96).  The SHA subsequently met with the Director to
discuss the situation and her findings.  (Doc. 32, Ex. B. at 31; Doc. 32, Ex. G Pt. II at
100).  She relayed the purported recommendations of the rehabilitation counselor.
She also expressed concern about Knepp's ability to attend AA meetings while
traveling and about Overhead's potential liability for Knepp's conduct, such as
driving a company vehicle.  (Doc. 32, Ex. G Pt. II at 100).  The  Director requested a

---

[4] Knepp disputes that these recommendations were made.  He contends that
the counselor did not recommend shorter working hours, and that the counselor
told the SHA that, while traveling, Knepp could attend AA meetings by telephone
or internet.  (Doc. 37, Att. 8 at 1-2).

copy of Knepp's driving record, which showed that Knepp had numerous pre-employment traffic violations for speeding, reckless driving, driving too fast for conditions, fleeing police, improper passing, driving with a suspended license, and driving under the influence, and that Knepp's driver's license had been suspended on several occasions and for a period of several years.  (Doc. 32, Ex. A at 30-32; Doc. 32, Ex. A Pt. II at 6-17; Doc. 32, Ex. B. at 53, 55; Doc. 32, Ex. G Pt. II at 101).

On November 4, 2001, Knepp was discharged from treatment.  (Doc. 32, Ex. B. Pt. II at 8).  Upon leaving he was advised not to consume any alcohol, and warned that, because he had relapsed from a prior rehabilitation, there was a high likelihood that he would relapse again.  (Doc. 32, Ex. A at 40, 48).  Further, it was recommended that he attend AA meetings at least weekly.  (Doc. 32, Ex. A at 42).

The following day Knepp met with his FST supervisor, the Director, and the Vice President.  (Doc. 32, Ex. B. at 64-71; Doc. 32, Ex. B. Pt. II at 11; Doc. 32, Ex. G Pt. II at 88, 110).  The group inquired about Knepp's treatment and how he was progressing, and discussed with him Overhead's substance abuse program, his unacceptable prior conduct, his driving record, and his history of alcohol abuse.  (Doc. 32, Ex. B. Pt. II at 11-12; Doc. 32, Ex. G Pt. II at 110).  The group informed Knepp that he was not going to be terminated from Overhead.  However, the group expressed specific concerns about Knepp's ability to perform the essential functions of the FST job in light of his conduct, his conviction for driving under the influence and their discovery that this was Knepp's second treatment for alcoholism in a relatively short period of time.  Overhead was worried about its

potential liability if it employed Knepp in a position that required him to operate a vehicle on public roads.  The group told Knepp that they would discuss the matter further and decide if he would be permitted to return to a field service position. (Doc. 32, Ex. B. Pt. II at 11-12; Doc. 32, Ex. G Pt. II at 110).

The Director asked the field service supervisor whether driving was a requirement for an FST position.  (Doc. 32, Ex. B. at 92-93).  The supervisor responded that driving was essential.  An FST was expected to drive to a given job site and, for safety reasons, was required to alternate driving when traveling long distances.  (Doc. 32, Ex. B. at 93-94).  The Director and Vice President discussed the matter, and decided to contact Overhead attorneys for advice.  (Doc. 32, Ex. G Pt. II at 111; see also Doc. 32, Ex. G Pt. II at 28 (notes from meeting)).  Ultimately, the company officers concluded that Knepp would be required to remain in Overhead's drug and alcohol program, and that he would be moved from the field service position to a position at the plant.  (Doc. 32, Ex. B. Pt. II at 12).

The Director subsequently drafted a memorandum addressed to Knepp and titled "job elimination."  The memorandum set forth the purported recommendations of Knepp's rehabilitation counselor regarding the reduction in working hours and regular attendance at AA meetings.  (Doc. 32, Ex. A Pt. II at 30). It stated that, given of the nature of the field service position, a reduction in working hours was not an option and that an FST would have difficulty attending AA meetings while traveling.  The memorandum also expresses concerns about potential liability problems if Overhead permitted Knepp to return to that

8

position.  (Doc. 32, Ex. A Pt. II at 30).  It concludes that "a better position for [Knepp] is back at the plant where he does not have to drive a company vehicle, can work regular and reduced hours, and attend regular AA meetings with the support of his family."  (Doc. 32, Ex. B. Pt. II at 9).

Upon returning to work Knepp was transferred from the field service position to a shipping job, and his wages were reduced from $13.05 to $12.33 per hour.[5]  (Doc. 32, Ex. B. Pt. II at 14).  Almost two months later, on December 28, 2001, he was laid off from Overhead.  (Doc. 32, Ex. B. Pt. II at 15).  He was recalled to work the following July.  (Doc. 32, Ex. D at 2).

Knepp commenced the instant action in November 2003, and filed an amended complaint in April 2004.  (See Docs. 1, 15).  The amended complaint alleges that Overhead failed to restore Knepp to his field service position and retaliated against him in violation of the FMLA, and discriminated against him in violation of the ADA and PHRA.  Overhead subsequently moved for summary judgment on these claims.  The motion is now ripe for disposition.

## II.    **Standard of Review**

"Summary judgment serves as a minimal but important hurdle for litigants to overcome before presenting a claim to a jury."  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004).  Faced with such a motion, the adverse party

---

[5] The FST position vacated by Knepp was never filled due, at least in part, to a reduction in Overhead's work on certain types of jobs.  (Doc. 32, Ex. F at 27-28; Doc. 32, Ex. H at 20).

must produce affirmative evidence, beyond the disputed allegations of the pleadings, in support of the claim.  FED. R. CIV. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Corneal v. Jackson Township, 313 F. Supp. 2d 457, 464 (M.D. Pa. 2003), aff'd, 94 Fed. Appx. 76 (3d Cir. 2004).  "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance."  Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001) (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989)). Only if this burden is met can the cause of action proceed.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see FED. R. CIV. P. 56(c), (e).

## III.  **Discussion**

### A.  **FMLA**

The FMLA was enacted to "balance the demands of the workplace with the needs of families."  29 U.S.C. § 2601(b)(1); Conoshenti v. Pub. Serv. Elec. & Gas, Co., 364 F.3d 135, 141 (3d Cir. 2004).  It provides that certain employees may take "reasonable leave for medical reasons," 29 U.S.C. § 2601(b)(1), (2), Conoshenti, 364 F.3d at 141, including any "serious health condition that makes the employee unable to perform the functions of [his or her] position," 29 U.S.C. § 2612(a)(1)(d); Chittister v. Dep't of Cmty. & Econ. Dev., 226 F.3d 223, 225 (3d Cir. 2000).

Two causes of action may arise from a violation of the FMLA:  an "interference" claim, alleging that the employer interfered with a FMLA right, and

a "retaliation" claim, alleging that the employer took an adverse employment action against the employee in retaliation for taking FMLA leave.  See Bearley v. Friendly, 322 F. Supp. 2d 563, 570-71 (M.D. Pa. 2004); Parker v. Hahnemann Univ. Hosp., 234 F. Supp. 2d 478 (D.N.J. 2002).  In the matter *sub judice*, Knepp sets forth both interference and retaliation claims.

### 1.   **FMLA Interference**

To succeed on a FMLA-interference claim, a plaintiff must demonstrate that he or she was entitled to and denied some benefit under the FMLA.  See Bearley, 322 F. Supp. 2d at 570-71.  The burden then shifts to the employer to show that the plaintiff would not have been entitled to that benefit even if the leave had not been taken.  See id.

Under the FMLA, an employee is entitled to be reinstated to his or her former, or an equivalent, position upon returning from leave.  29 U.S.C. § 2614(a)(1); Conoshenti, 364 F.3d at 141.  However, the right to reinstatement is qualified; it does not entitle an employee to a right, benefit, or position to which the employee would not "have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3)(B); Conoshenti, 364 F.3d at 141.  Hence, if the adverse employment decision occurs "for a reason unrelated to the leave[,] there is no right to reinstatement."  Id. at 141; see also Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002) (stating that employee must demonstrate ability to perform essential functions of the position to which he was not reinstated); 29 C.F.R. § 825.214(b)

(stating that employee unable to perform an essential function of the job has no right to restoration under the FMLA).

In the case *sub judice*, the evidence clearly demonstrates that Overhead appropriately determined that Knepp was unsuited for the FST position. The Vice President testified that FSTs are "critical" to the success of the business. An FST who is involved in physical altercations, arrives to work smelling of alcohol, or who does not arrive at all is obviously unacceptable. The former two also present safety concerns for the company. (Doc. 32 at Ex. H at 26; Doc. 41, Ex. 1 at 24-25).

The evidence also reveals that Overhead was concerned with its potential liability. Overhead quite properly believed that an employee such as Knepp—with an admitted drinking problem, an abysmal driving record replete with traffic citations and topped off with a DUI conviction, and questionable, if not dangerous, behavior—exposed the company to significant legal problems if he were employed in the FST position, which required driving on public roads.[6] (Doc. 32, Ex. B. at 42, 54, 88-91; Doc. 32, Ex. G Pt. II at 126; Doc. 32, Ex. H at 12, 13, 16; see also Doc. 32, Ex. H at 66; Doc. 41, Ex. P at 6). The court finds this a plausible and prudent explanation.

---

[6] Knepp also contends that, at the October 22nd meeting with the SHA and union representatives, he was promised his FST position upon return from treatment. This contention is belied by Overhead's alcohol program form, signed by Knepp and his union representatives, which contains no such promise. (Doc. 32, Ex. A at 29; Doc. 32, Ex. B at 28). Moreover, at the time of the October 22nd meeting, Overhead was not fully aware of the nature or extent of Knepp's alcohol problems or his horrible driving record.

Because there exists unrebutted evidence that Knepp would not be entitled to the field service position even if FMLA leave were not taken, summary judgment will be granted on this claim.

## 2.   **FMLA Retaliation**

The FMLA prohibits an adverse employment action taken in retaliation for an employee's FMLA leave.  See Victorelli v. Shadyside Hosp., 128 F.3d 184, 190 (3d Cir. 1997).  To assert a retaliation claim a plaintiff must demonstrate that:  (1) he or she took FMLA leave, (2) he or she suffered an adverse employment action, and (3) the adverse action was causally related to the leave.  Conoshenti, 364 F.3d at 146.

When a plaintiff presents "direct evidence" that his FMLA leave was a substantial factor in the adverse employment action, the burden shifts to the employer to demonstrate that the action would have taken place even if the FMLA leave was not considered in the decision-making process.  Id. at 147 (citing Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002)).  "Direct evidence" is evidence that would suffice to allow a jury to find that the employer placed "substantial negative reliance" on the taking of FMLA leave in deciding to impose the adverse employment action.  Id. at 147 n.10 (citing Conners v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998)).  Absent direct evidence, timing can be used to infer a causal connection between the leave and the adverse action, although it requires consideration "with a careful eye to the specific facts and circumstances encountered."  See Parker, 234 F. Supp. at 492 n.15 (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-80 (3d Cir. 2000)).  If the timing is not "unduly

suggestive," causation may still be inferred from circumstantial evidence of ongoing antagonism or inconsistent reasons for the action.  See id.

When the burden is shifted, the employer must demonstrate that it would have taken the same action for nondiscriminatory reasons.  However, it need not isolate the sole cause for its decision.  Conshoshenti, 364 F.3d at 147; Bearley, 322 F. Supp. 2d at 572.  Thereafter, the plaintiff can demonstrate that the employer's proffered reason is pretextual and rebut it by either (1) discrediting the reason circumstantially or directly , or (2) adducing evidence that discrimination was more likely than not a motivating or determinative cause of the action.  See id. at 571-73; see also Parker, 234 F. Supp. 2d at 487.

In the matter *sub judice*, Knepp contends that he was transferred from the FST position to a lower-paying plant position because of his decision to take FMLA leave.  Reviewing the record in the light most favorable to Knepp, a reasonable jury could arguably find a causal connection between his FMLA leave and the timing of his transfer.  See Bearley, 322 F. Supp. 2d at 571; cf. Williams v. Phila. Hous.  Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (reviewing temporal proximity between protected activity and adverse action in ADA case).

Nevertheless, Overhead has met its burden of rebuttal by setting forth legitimate, nondiscriminatory reasons for Knepp's transfer.  Even assuming that Knepp's counselor did not make the recommendations at issue, overwhelming evidence of record demonstrates that Overhead was concerned with its potential for liability if Knepp were placed in a position requiring driving on public roads.

14

(Doc. 32, Ex. B at 42, 54, 88-91; Doc. 32, Ex. G Pt. II at 120-21; Doc. 32, Ex. H at 12, 13, 16).  Indeed, deposition testimony reflects that Overhead sought to minimize this liability by confining Knepp to the plant in a position where he could be observed, and where any liability would be limited to worker's compensation claims.  (Doc. 32, Ex. B at 83-84; Doc. 32, Ex. H at 66; Doc. 41, Ex. P at 6).  This explanation is entirely plausible, and the record is devoid of any evidence that it is pretextual.[7]

Knepp also contends that he was laid off in retaliation for taking FMLA leave.  Reviewing the record in a light most favorable to Knepp, the court concludes that Knepp has not met his burden of establishing a causal connection between his layoff and his FMLA leave.  The timing of Knepp's layoff—almost two months after returning to work—is not so "unduly suggestive" as to infer retaliation.  See e.g. Williams, 380 F.3d at 760 (finding that, in ADA retaliation context, two month period between request for accommodation and adverse employment decision was not "unusually suggestive" as to establish a causal connection).  To the contrary, there is evidence of record that Overhead was concerned about the *brevity* of Knepp's FMLA leave, as the physician's certification called for a leave of absence four times as long as that actually taken.  (Doc. 32, Ex. G at 82).

---

[7] Indeed, circumstantial evidence suggests that Overhead has consistently honored its FMLA obligations.  Between January 1999 and November 2001, 241 instances of FMLA leave occurred.  In each instance the employee was reinstated to his or her former position.  (See Doc. 32, Ex. E at 5-10).

15

Assuming *arguendo* that Knepp has set forth a sufficient causal connection between the FMLA leave and his layoff, Overhead has presented uncontroverted evidence that Knepp's layoff was part of a cyclical program of layoffs, occasioned by market forces, and systematically administered according to employee seniority. Knepp has not proffered any evidence to discredit this, or to adduce that discrimination was more likely than not a motivating factor.[8]

Because a reasonable jury could not find that Knepp suffered an adverse employment decision in retaliation for his FMLA leave, Overhead's motion for summary judgment will be granted as to this claim.

**B.      ADA Discrimination**[9]

The ADA prohibits employer discrimination against "qualified individual[s] with a disability."  42 U.S.C. § 12112(a); <u>Rinehimer</u>, 292 F.3d at 380; <u>Marinelli v. City of Erie</u>, 216 F.3d 354, 359 (3d Cir. 2000).  A "qualified individual with a disability" is a person with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position."  42 U.S.C. § 12111(8);

---

[8] Indeed, the overwhelming evidence of record supports the proposition that layoffs were a standard part of Overhead's business practice.  (<u>See</u> Doc. 32, Ex. E at 12-21).  Knepp himself was laid off from Overhead almost every winter:  January 1997, March 1998, December 1998, December 1999, December 2001, and December 2002.  (Doc. 32, Ex. D at 2; <u>see also</u> Doc. 32, Ex. A at 10, 13).

[9] ADA and PHRA claims are analyzed under the same legal standards and, hence, this discussion applies equally to plaintiff's PHRA claims.  <u>See</u> <u>Rinehimer v. Cemcolift, Inc.</u>, 292 F.3d 375, 382 (3d Cir. 2002); <u>Salley v. Circuit City Stores, Inc.</u>, 160 F.3d 977, 979 n.1 (3d Cir. 1998).

Marinelli, 216 F.3d at 359.  A person has a disability if he or she: (1) has a physical or mental impairment that substantially limits one or more of his or her major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment.  42 U.S.C. § 12102(2); Marinelli, 216 F.3d at 359.  The term "major life activity" refers to "those activities that are of central importance to daily life." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002); Rinehimer, 292 F.3d at 381 n.1; Marinelli, 216 F.3d at 361.  Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(I).

In the matter *sub judice*, Knepp contends that he has an impairment in the form of alcoholism.[10]  However, under the ADA, alcohol and substance abuse are treated differently from other disabilities.  See Salley v. Circuit City Stores, Inc., 160 F.3d 977, 981 (3d Cir. 1998).  The pertinent section of the ADA provides:

> [An employer] may hold an employee who . . . is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the . . . alcoholism of such employee.

42 U.S.C. § 12114(c)(4).  It is undisputed that Knepp's alcohol-related behavior, as reported to Overhead by fellow employees and union representatives, was unacceptable for someone in a field service position.  An FST involved in physical altercations or who arrives to work smelling of alcohol presents a myriad of

---

[10]  The complaint avers that Knepp "suffer[s] from substance dependencies." (See Doc. 1 ¶ 20).  There is nothing of record upon which to infer that the phrase "substance dependencies" refers to anything other than alcohol.

significant safety concerns.  (Doc. 32 at Ex. H at 26; Doc. 41, Ex. 1 at 24-25).  As such, Knepp's alcohol-related behavior disqualified him from the FST position.  Cf. Smith v. Davis, 248 F.3d 249, 251 (3d Cir. 2001) ("An employer is not obligated to accommodate absenteeism attributable to alcoholism."); Sloop v. ABTCO, Inc., 178 F.3d 1285 (4th Cir. 1999) ("[W]hile alcoholic employees . . . are protected from adverse employment actions based upon their medical condition, the misconduct arising from their use of alcohol has never been protected."); Maddox v. Univ. of Tennessee, 62 F.3d 843, 848 (6th Cir. 1995) ("[I]t strains logic to conclude that . . . [inappropriate behavior] could be protected under the Rehabilitation Act or the ADA merely because the actor has been diagnosed as an alcoholic and claims that such action was caused by his disability.").

Nor does the evidence indicate that Knepp was "disabled."  For an employee to be "disabled" under the ADA, he or she must possess—or be treated by an employer as possessing—an impairment that substantially limits a major life activity.  See 42 U.S.C. § 1202(2); 29 C.F.R. § 1630.2(l); Rinehimer, 292 F.3d at 381; Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 187 (3d Cir. 1999).  There is insufficient evidence of record to support the proposition that Knepp possesses, or was viewed by Overhead as possessing, an impairment that substantially limits a major life activity.[11]  Alcoholism clearly affected Knepp's behavior, but it did not prevent him

---

[11]  See Hinnershitz v. Ortep of Pa., Inc., No. 97-CV-7148, 1998 WL 962096 (E.D. Pa. Dec. 22, 1998) (stating that alcoholism may only rise to the level of a disability where it substantially limits a major life activity), aff'd, 203 F.3d 817 (3d Cir. 1999); see also Szczesny v. Gen'l Elec. Co., 66 Fed. Appx. 388, 393 (3d Cir. 2003) (same).

from engaging and completing routine tasks or otherwise limit his functional capacity.  Indeed, the evidence demonstrates that even in the major life activity of "working" Knepp is not limited:  he continued to work for Overhead in various other positions, and to work in construction and commercial trucking jobs.[12]  (Doc. 32, Ex. A at 8, 20; Doc. 32, Ex. B at 82-83, 98; Doc. 32, Ex. D at 3, 4; Doc. 32, Ex. H at 19; Doc. 32, Ex. J at 3; Doc. 41, Ex. U at 19).  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999) ("To be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice."); see also Sullivan v. Neiman Marcus Group, Inc., 358 F.3d 110, 116-17 (1st Cir. 2004) (finding that alcoholism did not substantially interfere with work where plaintiff able to hold jobs prior to and after treatment).  And Overhead clearly did not regard Knepp as disabled:  he was not excluded from a class of jobs, but from only one specific job—the eliminated FST position.  (Doc. 32, Ex. B at 82-83, 98).  See Tice v. Centre Area Transp. Auth., 247 F.3d 506, 516 (3d Cir. 2001) (holding that employee is not covered under ADA when excluded from one particular job, rather than class of jobs); Taylor, 177 F.3d at 180 (same).

---

[12]  Following the elimination of his FST position, Knepp worked for Overhead in various other positions, including production line worker, ship docking worker, and goods production worker, and it appears that he was eligible to apply for a forklift position.  (Doc. 32, Ex. B at 82-83; Doc. 32, Ex. D at 3, 4; Doc. 32, Ex. H at 19; Doc. 32, Ex. J at 3).

Based on these facts, Knepp cannot be deemed a "qualified individual with a disability" under the ADA.[13]

## IV.   Conclusion

Because a reasonable jury could not find that Knepp was entitled to return to a field service position, that Overhead retaliated against Knepp for taking FMLA leave, or that Knepp is an individual covered by the ADA, Overhead's motion for summary judgment will be granted.[14]


An appropriate order will issue.

---

[13]   Even if Knepp established that he was an "individual with a disability," the evidence of record supports a finding that driving is an essential requirement of the field service position (see Doc. 32, Ex. B. Pt. II at 10 (FST job description); Doc. 32, Ex. A at 10-11; Doc. 32, Ex. B. at 22-24, 93-94; Doc. 32, Ex. F at 16-17; Doc. 32, Ex. G Pt. II at 117, 159;  Doc. 32, Ex. M at 2; Doc. 41, Ex. Q at 2; Doc. 37, Att. 3 at 6 (testimony regarding FST responsibilities)).  See 29 C.F.R. § 1630.2(n) (defining "essential function").  As such, removal of the driving requirement would not be a reasonable accommodation.  See Skerskie v. Time Warner Cable Co., 257 F.3d 273, 286 n.4 (3d Cir. 2001) (stating that employers are not required to remove an essential function or restructure a job to avoid it).  Further, given Knepp's alcoholism and the behavioral problems associated therewith, it is highly probable that placing him in a position that required driving would create a direct threat to the safety of his coworkers and the public.  See 42 U.S.C. § 12113 (individual that is a "direct threat" to health or safety of others may not be qualified employee); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 769 n.15 (3d Cir. 2004) ("[A]n employer is not required to provide a reasonable accommodation if it . . . would pose a 'direct threat' to the safety of the employee or others.") (quoting 29 C.F.R. § 1630.15(b)(2)); Rizzo v. Children's World Learning Ctr., 213 F.3d 209, 217 (5th Cir. 2000) ("In the context of the ADA, ability to perform an essential function means, *inter alia*, doing so without constituting a direct threat.").

[14]   Defendant's motion (Doc. 44) to deem admitted any and all disputed facts, and plaintiff's motion (Doc. 45) to strike defendant's motion, will be denied as moot.

                                        S/ Christopher C. Conner
                                        CHRISTOPHER C. CONNER
                                        United States District Judge

Date:        August 16, 2005

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL KNEPP,** | : | **CIVIL ACTION NO. 1:03-CV-1993** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **OVERHEAD DOOR CORPORATION** | : | |
| **and VINCENT CANDIELLO,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 16th day of August, 2005, upon consideration of defendant's

motion for summary judgment (Doc. 29), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1.  The motion for summary judgment (Doc. 29) is GRANTED.

2.  The motions (Docs. 44, 45) to treat facts as admitted and to strike are
    DENIED as moot.

3.  The Clerk of Court is directed to enter JUDGMENT for defendant and
    against plaintiff.

4.  The Clerk of Court is directed to CLOSE this case.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge